UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SYDNEY JAE GRAY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-4672 |
| | § | |
| MINNESOTA LIFE INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Pending before the court is plaintiff Sydney Jae Gray's ("Gray") motion for judgment on the administrative record.  Dkt. 25.  Defendant Minnesota Life Insurance Company ("Minnesota Life") responded and requested judgment in its favor.  Dkt. 28.  Gray replied.  Dkt. 30.  Minnesota Life also filed a trial brief.  Dkt. 26.  Gray filed an unopposed motion for oral argument (Dkt. 32) and an opposed motion for leave to file trial brief.[1]  Dkt. 36.  Minnesota Life responded.  Dkt. 37. Gray replied.  Dkt. 39.  Having considered the motions, responses, replies, administrative record, and applicable law, the court is of the opinion that Gray's motion for judgment on the administrative record should be DENIED, and Minnesota Life's request for judgment in its favor should be GRANTED.

I. BACKGROUND

Gray brings this action under 29 U.S.C. § 1132(a)(1)(B) as attorney-in-fact for her husband, Michael Shea Gray (as there are two Grays in this opinion, the court will refer to Michael Shea

---

[1] Gray withdrew her request for oral argument pending a ruling on the motion for leave to file trial brief.  Dkt. 36.  The motion for leave to file trial brief is GRANTED.  Minnesota Life's request to file a reply is DENIED AS MOOT.  Dkt. 37.

Gray as "Mr. Gray"). Dkt. 25 at 5.[2]  Mr. Gray was formerly employed by ENGIE Holdings, Inc.

("ENGIE").  *Id.* at 6.  ENGIE provided Mr. Gray with life insurance, which included accidental

death and dismemberment ("AD&D") coverage through Minnesota Life.  *Id.*  On November 27,

2016, while visiting family in Sanger, Texas, Mr. Gray fell and suffered severe injuries.  *Id.* at 7.

Mr. Gray filed a claim for benefits sometime in April 2017.[3]  Administrative Record ("AR") 98.[4]

Minnesota Life denied Mr. Gray's claim for AD&D benefits on December 11, 2017.  *Id.* at 493.

Mr. Gray appealed, but the appeal was denied on September 13, 2018.  Dkt. 25 at 10; Dkt. 26 at

16.  Gray filed this action on November 27, 2019.  Dkt. 1.  On October 1, 2020, Gray filed this

motion for judgment on the administrative record pursuant to Federal Rule of Civil Procedure 52.

Dkt. 25.  The motion is ripe for disposition.

## II. LEGAL STANDARD

### A. Standard of Review

The parties agree that this action is governed by the Employee Retirement Income Security

Act of 1974 ("ERISA").  Dkt. 25 at 5; Dkt. 26 at 17.  Absent a valid delegation clause vesting the

claims administrator with discretionary authority, the standard of judicial review for ERISA

benefits denials challenged under 29 U.S.C. § 1132(a)(1)(B) is *de novo*.[5]  *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989); *see also Ariana M. v. Humana Health*

---

[2] For ease of understanding, the court references the electronic page numbers on all exhibits rather than the pagination on the exhibits themselves.

[3] Gray states that a claim for benefits was filed on February 14, 2017, and then again on April 18, 2017.  Dkt. 25 at 7.  Minnesota Life states that the benefits claim was filed on April 10, 2017, but then it later alleges that a claim was initiated on April 21, 2017.  *Compare* Dkt. 26 at 6, *with* Dkt. 26 at 10.  The actual date the claim for benefits was originally filed is not clear from the record, but it appears to have been filed sometime in April 2017, as evidenced by Mr. Gray's signature on the claim form, which is dated April 10, 2017.  AR 98.

[4] The administrative record is contained in docket entries 20-1 through 20-17.  The court cites only the administrative record pagination for ease of reference.

[5] The parties agree that the standard of review in this case is *de novo*.  Dkt. 25 at 11; Dkt. 26 at 17.

*Plan of Tex., Inc.*, 884 F.3d 246, 256 (5th Cir. 2018) (en banc) (adopting the majority approach and holding that the *de novo* standard in *Firestone* applies when reviewing a denial of benefits regardless of whether that denial is based on legal or factual grounds).

"Although the Fifth Circuit has not specified what *de novo* review requires in ERISA cases, other circuits and district courts provide instructive guidance." *Batchelor v. Life Ins. Co. of N. Am.*, No. 4:18-CV-3628, 2020 WL 7043476, at *1 (S.D. Tex. Dec. 1, 2020) (Ellison, J.). "Under the *de novo* standard of review, the court's task 'is to determine whether the administrator made a correct decision.'" *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1030 (E.D. Tex. 2019) (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. App'x. 827, 832 (10th Cir. 2008)). The decision to deny benefits is "not afforded deference or a presumption of correctness." *Id.* The court "must stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Byerly v. Standard Ins. Co.*, No. 4:18-CV-00592, 2020 WL 1451543, at *18 (E.D. Tex. Mar. 25, 2020), *aff'd*, No. 20-40302, 2021 WL 364243 (5th Cir. Feb. 2, 2021) (cleaned up). The court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden." *See Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010).

**B. Burden of Proof**

"A claimant under section 1132(a)(1)(B) has the initial burden of demonstrating entitlement to benefits under an ERISA plan." *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n. 9 (5th Cir. 1993). "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010); *see also Horton v. Reliance Standard Life Ins. Co.*, 141

F.3d 1038, 1040 (11th Cir. 1998) (per curiam) ("A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits."). "The burden is on the claimant 'regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial.'" *Lann v. Metro. Life Ins. Co.*, 371 F. Supp. 3d 1185, 1191 (N.D. Ga. 2019) (quoting *Lamb v. Hartford Life and Accident Ins. Co.*, 862 F. Supp. 2d 1342, 1349 (M.D. Ga. 2012)).

The Fifth Circuit has not directly addressed the standard for a claimant's burden of proof for a benefits denial under ERISA, but other circuits and district courts again provide guidance. On *de novo* review of a plaintiff's claim for benefits, "the standard is . . . whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Niles*, 269 F. App'x at 833; *see also Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 112–13 (1st Cir. 2017) ("[A]n ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage."); *Hill v. Hartford Life & Accident Ins. Co.*, No. 1:08-CV-0754-CC, 2009 WL 10664970, at *7 (N.D. Ga. Sept. 16, 2009) ("The plaintiff must prove by a preponderance of the evidence that he is entitled to disability benefits within the meaning of the policy.").

## C. Federal Rule of Civil Procedure 52

A motion for judgment on the administrative record is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." *Hall v. Mut. of Omaha Ins. Co.*, No. 4:16-CV-160-DMB-JMV, 2018 WL 1440075, at *2 (N.D. Miss. Mar. 22, 2018) (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)). "If such a motion is treated as a summary judgment motion, the district court must limit its inquiry to determining whether questions of fact

4

exist for trial."[6]  *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 110, 116 (2d Cir. 2011).  However, "it may be appropriate for the district court to treat such a motion as requesting 'essentially a bench trial on the papers with the District Court acting as the finder of fact.'"  *Id.* (quoting *Muller*, 341 F.3d at 124).  "In that scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions."  *Id.*  Both Gray and Minnesota Life have consented to a trial on the record pursuant to Federal Rule of Civil Procedure 52.  Dkt. 25 at 11–12; Dkt. 26 at 5.

Rule 52 governs "an action tried on the facts without a jury."  Fed. R. Civ. P. 52(a).  Under Rule 52, the district court "must find the facts specially and state its conclusions of law separately."  *Id.*  "Rule 52(a) does not require that the district court set out findings on all factual questions that arise in a case.  *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997).  Instead, a court's "[f]indings satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision."  *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985).

In the context of an ERISA claim, "using Rule 52 is effective . . . because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment."  *Pike*, 368 F. Supp. 3d at 1025.  "[I]n a bench trial on the record, the judge will . . . make findings of fact under Federal Rule of Civil Procedure 52(a)."  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).  "[T]he judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."  *Id.*  After conducting a bench trial "on the papers," the court "has an obligation to make explicit findings of

---

[6] Notably, "there is no right to a jury trial in ERISA denial-of-benefits cases."  *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 191 n. 19 (5th Cir. 2012).

fact and conclusions of law explaining the reasons for its decision." *Muller*, 341 F.3d at 124. Under Rule 52(a), the court first lays out its findings of fact followed by its conclusions of law. *See Batchelor*, 2020 WL 7043476, at *2.

### III. FINDINGS OF FACT

#### A. The Group Policies

Mr. Gray was hired by ENGIE on July 28, 2014.  Dkt. 25 at 6.  ENGIE provided Mr. Gray with life insurance, which included AD&D coverage by Minnesota Life.  *Id.*  The basic AD&D coverage was in the amount of $298,000.  AR 95, 198.  Mr. Gray purchased voluntary AD&D coverage in the amount of $518,000.  *Id.*  Thus, the total amount of AD&D coverage under the policy is $816,000.  *Id.*

> The AD&D Policy Rider ("the Rider") states in relevant part:
>
> Accidental death or dismemberment by accidental injury as used in this rider means that the certificate holder's death or dismemberment results, directly and independently of all other causes, from an accidental bodily injury which is unintended, unexpected, and unforeseen.  The bodily injury must be evidenced by a visible contusion or wound, except in the case of accidental drowning.  The bodily injury must be the sole cause of death or dismemberment.

*Id.* at 37.  The Rider also contains certain exclusions.  The Rider specifically excludes coverage "where the certificate holder's death or dismemberment is caused directly or indirectly by, results from, or where there is a contribution from . . . bodily or mental infirmity, illness or disease."  *Id.*

The Group AD&D Insurance Policy ("the Group AD&D Policy") states in relevant part:

> Accidental death or dismemberment by accidental injury means that an insured's
>
> death or dismemberment results, directly and independently of all other causes,
>
> from an accidental injury which is unintended, unexpected, and unforeseen.

*Id.* at 63. The Group AD&D Policy also requires that "[t]he injury must occur while the insured's coverage is in force. The insured's death or dismemberment must occur within 365 days after the date of injury." *Id.* It excludes coverage "where the insured's death or dismemberment results from or is caused directly or indirectly by . . . bodily or mental infirmity, illness or disease." *Id.* at 65.

Both the Rider and the Group AD&D Policy (collectively, "the Group Policies") place the burden on the insured to submit proof of loss showing that the insured suffered dismemberment as a result of an accidental injury. *Id.* at 38, 64.

**B. Mr. Gray's History of Seizures and the Incident**

Mr. Gray was in good health until he began having "episodes of transient intermittent spells of altered awareness" in 2015. *Id.* at 607. In January 2016, he was involved in a motor vehicle accident, after which he began having seizures.[7] *Id.* at 90, 653, 662. He had numerous seizures

---

[7] It is unclear exactly when Mr. Gray's seizure disorder started. Minnesota Life contends that Mr. Gray's seizures started before the January 2016 motor vehicle accident. Dkt. 26 at 22. Gray contends that Mr. Gray started having seizures only after the January 2016 motor vehicle accident. Dkt. 25 at 23; Dkt. 36-2 at 5–6. As evidence that the seizures started only after the accident in January 2016, Gray submits medical records which quote her or Mr. Gray himself about when the seizures started, but those records are contradictory. In several medical records, it is noted that Mr. Gray's seizures began only after the January 2016 car accident. AR 90, 653, 662. However, in medical records from September 2016, a physician noted that Mr. Gray reportedly began having episodes of "transient intermittent spells of altered awareness" in 2015. *Id.* at 607. It is unclear whether Mr. Gray's "spells of altered awareness" are distinct from his seizures. Still, most of the administrative record that addresses this issue suggests that Mr. Gray's seizures started after the January 2016 car accident. *Id.* at 90, 653, 662. Thus, although it is not entirely clear from the record when the seizures started, the court will assume that the seizures started after the January 2016 car accident.

over the following months and switched medications or dosages of medication several times in an attempt to get his seizure disorder under control. *Id.* at 607. Then in September 2016, he had a seizure while driving, which caused him to lose control of his car and drive up a freeway ramp where he was hit by a bus. *Id.* Mr. Gray's son was a passenger in the car at the time of the accident, and he reported that Mr. Gray lost consciousness before the accident. *Id.*

After the accident, Mr. Gray had a neurology consult for seizure management. *Id.* While he was waiting for someone to come pick him up after the consult, he had another episode "of eyes wide open and convergent and upward gaze" during which he was "unresponsive to name calling." *Id.* The episode lasted approximately a minute. *Id.* He then "regained consciousness but was confused" for five to ten minutes after the episode. *Id.*

Then on November 26, 2016, while visiting family in Sanger, Texas, Mr. Gray had two additional episodes. *Id.* at 662, 671. Mr. Gray's sister-in-law reported that Mr. Gray had a seizure during which a relative "caught him and laid him down on the couch" so that he would not hit his head. *Id.* at 662. Also, while playing basketball that day, Mr. Gray "stumbl[ed] and was not feeling well." *Id.* at 671.

The next day, Mr. Gray was in the kitchen preparing lunch when he had another seizure and suddenly fell backwards. *Id.* at 98, 414, 420, 684. Mr. Gray's head hit the tile floor twice, and he began bleeding and vomiting, suffering two grand mal seizures. *Id.* at 98–99, 671, 684. A family member called 911, and Mr. Gray was rushed in an ambulance to an emergency care facility. *Id.* at 89, 99, 684. He was transferred by helicopter to a more advanced facility in Fort Worth, where he underwent various medical procedures, including a craniectomy to evacuate a subdural hematoma. *Id.* at 90, 99, 401. As a result of his seizure and fall, Mr. Gray suffered a

8

total loss of sight to his right eye and paralysis on the right side of his body so that both his right arm and right hand are no longer functioning.  Dkt. 25 at 7–8; AR 94, 351, 359.

Gray contends that Mr. Gray's fall was not caused by a seizure, but the evidence overwhelmingly suggests otherwise.[8]  Mr. Gray had an extensive history of seizures.  AR 607, 662, 671.  According to first responders, at the time of the incident, Mr. Gray "was standing while preparing a plate of food, seized, fell back and hit his head on the tile."  *Id.* at 296.  A physician who treated Mr. Gray after his fall noted that 1) Mr. Gray seemed to have a seizure disorder, and 2) that on the date of Mr. Gray's injuries, he "seemingly had a seizure" and fell and hit his head.  *Id.* at 414, 420.  Mr. Gray's wife reportedly stated that, on the day of the incident, Mr. Gray "was standing up and then limply slumped to the floor."  *Id.* at 671.  She said it "seemed like he passed out."  *Id.*  Accordingly, the court finds that Mr. Gray's fall was caused by a seizure.

## C. The Claim

Mr. Gray filed a claim with Minnesota Life sometime in April 2017.[9]  The medical records Mr. Gray submitted in support of his claim indicate that he was receiving treatment for a disease or illness at the time of his injury.  *Id.* at 100.  Minnesota Life had the claim reviewed by a physician, Maryam Shapland.  Dkt. 28 at 8.  After reviewing the claim, Dr. Shapland questioned

---

[8] Additionally, Gray misapprehends the burden of proof in this case; she argues that "there is no direct evidence in the administrative record that Mr. Gray's fall" resulted from a seizure or seizure disorder.  Dkt. 25 at 16.  But Gray has the burden of proof and must demonstrate by a preponderance of the evidence entitlement to benefits under the Group Policies.  *See* Part II.B, *supra*.  Moreover, under the terms of the Group Policies, the burden is on the insured to submit proof of loss establishing that the insured suffered dismemberment due to an accidental injury.  AR 38, 64.  Gray submits no evidence suggesting a cause other than a seizure.  At most, she submits evidence which states that the cause of Mr. Gray's fall is "unclear."  AR 670.  That is not enough to meet her burden.

[9] The exact date is not clear.  *See supra* note 3.

9

whether a medical event could have caused Mr. Gray's fall, and thus, Minnesota Life requested additional medical records from Mr. Gray. *Id.*

Upon receipt of additional medical records from Mr. Gray, Dr. Shapland conducted another review during which she determined that Mr. Gray had a history of seizures and that his seizure disorder had caused his fall and subsequent injuries. AR 90. Accordingly, on December 11, 2017, Minnesota Life sent Mr. Gray a letter denying his claim because his "fall was the result of a medical condition." *Id.* at 493. Minnesota Life stated that, according to information it received, Mr. Gray had suffered a seizure, which caused him to fall and hit his head, which resulted in blindness. *Id.* The letter also informed Mr. Gray of his right to appeal the claim denial. *Id.*

On August 11, 2018, Mr. Gray filed an appeal in which he argued that the reason for his fall was unclear and that there was no evidence of a seizure. *Id.* at 562–685. He also argued that, even if the fall had been the result of a seizure, he was still entitled to coverage under the Group Policies because 1) any seizure disorder was caused by a traumatic brain injury from the January 2016 motor vehicle accident, and 2) any dismemberment which occurs within 365 days after the date of an injury is covered by the Group Policies, and Mr. Gray's dismemberment occurred during the 365-day window after the January 2016 accident. *Id.* at 565–66.

On September 13, 2018, Minnesota Life denied Mr. Gray's appeal after a second doctor conducted an independent review. *Id.* at 87, 689–90. Minnesota Life concluded that Mr. Gray was not entitled to coverage for two reasons. *Id.* at 689–90. First, Minnesota Life found that Gray's injury was not "unexpected or unforeseen" as required by the Group Policies since he had an extensive history of seizures, including a seizure the day before the seizure that caused the fall, and his seizure disorder was seemingly not well controlled by medication. *Id.* Additionally, Minnesota Life reasoned that the Group Policies exclude injuries caused by "bodily or mental

10

infirmity, illness or disease," and that Mr. Gray had been having seizures like the one which caused his fall since at least January 2016; thus, his injuries were caused by a seizure disorder and were excluded from coverage.  *Id.*

### IV. CONCLUSIONS OF LAW

#### A. Coverage under the Group Policies

Under the Group AD&D Policy, "dismemberment by accidental injury means that an insured's death or dismemberment results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen." *Id.* at 63.  Under the Rider, the language is almost identical: "dismemberment by accidental injury as used in this rider means that the certificate holder's death or dismemberment results, directly and independently of all other causes, from an accidental bodily injury which is unintended, unexpected, and unforeseen." *Id.* at 37.

"[T]he words of an insurance contract should be given their plain meaning." *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 103 (5th Cir. 1993).  "[W]here policies provide that an accident must 'directly and independently' be the cause of a loss, the general rule is that if disease is a concurrent proximate cause, the insurance company is not liable." *Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335, 1342 (5th Cir. 1983).  "When the facts are such that neither the accident nor the pre-existing disease can be isolated as the proximate cause, and it is concluded that both combined or operated to produce the harm, the insurer is not liable." *Id.* (cleaned up).  "[I]n order to recover benefits, the [accidental injury] must be the sole proximate cause of [the claimant's] death, with no concurrent proximate causes acting alongside it." *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 893 (5th Cir. 2018); *see also Cumbest v. Gerber Life Ins. Co.*, No. CIV.A. 1:07CV968WJGJ, 2009 WL 3011217, at *10 (S.D. Miss. Sept. 16, 2009) (reasoning that a policy

which defined the word "injury" as "accidental bodily injury . . . direct and independent of any other cause" showed the defendant insurance company's intent "to exclude from coverage losses in which 'disease' caused or contributed to the death" and holding that the decedent's loss was excluded from coverage because it was "caused by or contributed to by" the decedent's cardiac arrest).

Under the terms of the Group Policies, in order to establish entitlement to coverage, Gray must show that Mr. Gray's dismemberment resulted from an accidental injury "directly and independently of all other causes." AR 37, 63. Gray contends that Mr. Gray is entitled to coverage under the Group Policies because Mr. Gray's seizures were caused by the January 2016 car accident. Dkt. 36-2 at 5–6. However, under the court's interpretation of the Group Policies, even if the car accident caused Mr. Gray's seizure disorder, Mr. Gray is not entitled to coverage. To recover benefits in a case where the insurance policy limits coverage to dismemberment from an accidental injury "directly and independently of all other causes," the car accident in January 2016 must have been the "sole proximate cause" of Mr. Gray's injuries, and it was not. *See e.g.*, *Wells*, 885 F.3d at 893. Gray acknowledges that "it is undisputed that [Mr. Gray's] traumatic brain injury—not any seizure itself—caused [his] blindness and hemiplegia." Dkt. 36-2 at 6; *see also* Dkt. 25 at 20 ("[I]t is undisputed that Mr. Gray's blindness and hemiplegia [were] caused by a head injury resulting from a fall . . . [e]ven if a seizure caused the fall . . . it did not cause the blindness and hemiplegia."). Therefore, the January 2016 car accident that caused Mr. Gray's seizure disorder is only a cause of a cause of a cause. The car accident caused the seizure disorder that caused Mr. Gray's seizures. AR 90, 653, 662. Mr. Gray had a seizure on November 27, 2016,

which caused him to fall and hit his head on the tile, which is ultimately what caused his injuries.[10]
*See* Part III.B, *supra*.  In other words, Mr. Gray's seizure disorder caused him to fall and hit his
head, but the head trauma from the fall is ultimately what caused his injuries—not the seizure
itself.  *Id.*  Thus, Mr. Gray is not entitled to coverage under the Group Policies because his car
accident was not the "sole proximate cause" of his injuries.  *Wells*, 885 F.3d at 893.

Gray cites to *Wells* for the proposition that AD&D coverage is "not necessarily precluded
'by later incidents directly related to and arising solely from the accident.'"  Dkt. 36-2 at 6 (quoting
*Wells*, 885 F.3d at 893).  But *Wells* is inapposite.  The decedent in *Wells* suffered from a mosquito
bite, which ultimately caused West Nile Encephalitis ("WNE").  *Wells*, 885 F.3d at 887–88.  The
decedent had a history of obesity, diabetes, and hypertension.  *Id.* at 887.  The defendant insurance
company argued that the decedent's "preexisting conditions and post-accident complications"
exacerbated his WNE so that the decedent's mosquito bite was not the "sole proximate cause" of
his death.  *Id.* at 893–96.  The court rejected that argument and reasoned that "complications arising
directly from, solely because of, and dependent upon [an] accidental injury may not be concurrent

---

[10] Gray cites to two cases for the proposition that Mr. Gray's seizure did not cause his injuries.
Dkt. 25 at 19–20 (citing *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 829–32 (10th Cir. 2008);
*Nat'l Life & Accident Ins. Co. v. Franklin*, 506 S.W.2d 765, 766–67 (Tex. App.—Houston [14th
Dist.] 1974, writ ref'd n.r.e.)).  In *Kellogg*, the court held that a decedent's death was caused by "a
skull fracture resulting from [a] car accident"—not a seizure—even though a seizure caused the
car crash.  *Kellogg*, 549 F.3d at 832.  In *Franklin*, the court held that the decedent's death after
seizing and drowning in a bathtub was caused by drowning—not a seizure—because "there [was]
evidence of a seizure but there [was] no causal link with the fall" and "the epilepsy was, at most,
a remote cause."  *Franklin*, 506 S.W.2d at 767–68.  First, both *Kellogg* and *Franklin* are factually
distinguishable from this case.  Additionally, the court rejects Gray's argument since it is
inconsistent with her argument that Minnesota Life wrongly denied Mr. Gray's claim because Mr.
Gray's injuries were caused by a seizure disorder, which was caused by a car accident.  *See* Dkt.
36-2 at 5–6.  To the extent that Gray intends to argue that Mr. Gray's seizure was only a remote
cause of his injuries, and that Mr. Gray's subsequent fall was an accident not causally linked to
the seizure which resulted in the fall, the court rejects that argument.

proximate causes of an accidental death sufficient to strip the accident of its 'sole proximate cause' status." *Id.* at 894.

In contrast to the decedent in *Wells* whose complications arose directly from an accidental injury, Mr. Gray's November injuries did not arise "solely because of, and dependent upon" an accidental injury. *Id.* As previously discussed, Mr. Gray was in a car accident, after which he began having seizures. *See* Part III.B, *supra.* Months later, his seizure disorder caused him to fall and hit his head, and the head trauma from the fall is ultimately what caused his injuries—not the seizure itself. Dkt 36-2 at 6; Dkt. 25 at 20. Thus, the court is not persuaded by *Wells*.

Moreover, there is another reason that Mr. Gray is not entitled to coverage. His injuries were not "unexpected" or "unforeseen" as required by the Group Policies. AR 37, 63. The Group Policies do not define "unexpected" or "unforeseen." Thus, both terms should be interpreted in accordance with their plain meaning. *See Davis v. Life Ins. Co. of N. Am.*, 379 F. App'x 393, 396 (5th Cir. 2010) (finding a plan administrator's interpretation of an undefined term in an insurance policy reasonable because it was interpreted in "a manner consistent with the term's plain meaning"); *see also Riverwood Int'l Corp. v. Emps. Ins. of Wausau*, 420 F.3d 378, 383 (5th Cir. 2005) (reasoning that "[t]he fact that a term is not defined in a policy . . . does not alone make it ambiguous" and noting that "[i]nstead, the term . . . must be given its plain meaning."). Thus, the court interprets the terms "unexpected" and "unforeseen" in a manner consistent with their plain meaning. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "unforeseen" as "[n]ot foreseen; not expected") (defining "unexpected" as "[h]appening without warning; not expected"). Mr. Gray had a long history of seizures and even had a seizure the day before the fall that caused his injuries. *See* Part III.B, *supra.* During that seizure, he did not fall and hit his head only because

14

a relative caught him and laid him down on a couch.  AR 662.  Sadly, the seizure and fall that caused Mr. Gray's injuries did not happen unexpectedly or without warning.

Gray asks the court to apply a standard she cites from *Todd*, but *Todd* is inapposite.  Dkt. 25 at 14 (quoting *Todd v. AIG Life Insurance Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995)).  In *Todd*, the court held that a decedent's death was an "accident" within the meaning of a particular accidental death policy after the decedent died while engaged in autoerotic asphyxiation, which is "the practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure."  *Todd*, 47 F.3d at 1450.  The court rejected the defendant insurance company's argument that a death caused by autoerotic asphyxiation could not be accidental because the injury was intentionally inflicted.  *Id.* at 1452.  The court reasoned that it was undisputed that the decedent "neither intended nor expected to die as a result of his autoerotic conduct" and that "the likelihood of death from autoerotic activity [fell] far short of what would be required to negate coverage under the policy." *Id.* at 1456.  Gray contends that *Todd* applies and argues that Mr. Gray did not expect to "fall while preparing his lunch in a kitchen with a tile floor."  Dkt. 25 at 14.  But *Todd* is both factually and legally distinguishable; it addressed the narrow issue of whether an unintended death by autoerotic asphyxiation could be accidental within the meaning of a particular accidental death policy.  Thus, the court declines Gray's request to apply *Todd* here.

The court need not address Gray's argument that Mr. Gray's injuries are not excluded from coverage by any exclusions under the Group Policies since Mr. Gray is not entitled to coverage because 1) Mr. Gray's injuries were not "unexpected" or "unforeseen," and 2) Gray is unable to establish that Mr. Gray's injuries were solely caused by the January 2016 car accident.  Dkt. 25 at

15–21.  Thus, the court turns to the issue of whether Minnesota Life erred by not providing Mr. Gray with a full and fair review as required by ERISA.

## B. Full and Fair Review

"The provision governing claims procedure under ERISA provides that every employee benefit plan shall 'afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.'"  *Lejeune v. Prudential Ins. Co. of Am.*, No. CV 19-01270, 2021 WL 41659, at *2 (W.D. La. Jan. 4, 2021) (quoting 29 U.S.C § 1133(2)).  "To comply with the 'full and fair review' requirement in deciding benefit claims under ERISA, a claim administrator must provide the specific grounds for its benefit claim denial."  *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009).  Courts evaluate challenges to ERISA procedures "under the substantial compliance standard."  *Id.*; *see also Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 (5th Cir. 2005) (holding that "substantial rather than strict compliance with ERISA § 1133 . . . is all that the law requires").  "This means that [t]echnical noncompliance with ERISA procedures will be excused so long as the purposes of section 1133 have been fulfilled."  *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006) (internal quotations omitted).  "The purpose of section 1133 is to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial."  *Cooper*, 592 F.3d at 654–55 (cleaned up).  The final level of administrative review is the most significant in determining whether a plan is in substantial compliance.  *See Love v. Dell, Inc.*, No. A-07-CA-498-SS, 2008 WL 11411826, at *3 (W.D. Tex. Apr. 2, 2008), *aff'd*, 551 F.3d 333 (5th Cir. 2008).

16

First, Gray argues that Minnesota Life erred because it ignored the opinions of physicians who actually treated Mr. Gray and "cherry-picked" information supporting a denial of benefits.[11] Dkt. 25 at 21–22.  The court rejects this argument because "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965 (2003); *see also Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 250 (5th Cir. 2007) ("[P]lan fiduciaries are allowed to adopt one of two competing medical views.").  "This is so even if the consulting physician only reviews medical records and never physically examines the claimant, taxing to credibility though it may be."  *Gothard*, 491 F.3d at 249.

Gray next contends that Minnesota Life failed to provide a full and fair review when it redacted portions of the administrative record allegedly protected by attorney-client privilege. Dkt. 25 at 22.  Minnesota Life argues that the redactions did not prevent Gray from getting a full and fair review and that Gray was not prejudiced by any redactions.  Dkt. 28 at 26–27.  Minnesota Life also argues that Gray should have filed a motion to compel by the court's deadline for dispositive and pretrial motions on October 1, 2020, and that any objections to the redactions in the administrative record should be rejected as untimely.  *Id.*

"An ERISA plan is a separate legal entity from its sponsor . . . and a plan's administrator owes a fiduciary duty to the plan's beneficiaries, not its sponsor."  *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992) (internal citations omitted).  Accordingly, "[w]hen an attorney advises a plan administrator . . . concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator."  *Id.*  Thus, "an ERISA

---

[11] Notably, only one of Mr. Gray's treating physicians concluded that his injuries were not caused "directly or indirectly" by a seizure.  *See* AR 100.

fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration." *Id.* Courts have recognized that ERISA's "full and fair review" requires "[t]he opportunity to review materials relevant to a claim determination" and that allowing insurers to limit access to information regarding plan administration by claiming attorney-client privilege would frustrate the goal of "full and fair review." *Smith v. Jefferson Pilot Fin. Ins. Co.*, 245 F.R.D. 45, 51 (D. Mass. 2007); *see also Christoff v. Unum Life Ins. Co. of Am.*, No. 017CV03512DWFKMM, 2018 WL 1327112, at *6 (D. Minn. Mar. 15, 2018) ("Allowing an insurer to claim attorney-client privilege over . . . plan-administration matters would frustrate the purpose of the disclosure requirement—*i.e.*, ensuring a claimant's full and fair review of the evidence the administrator relied on in making a decision to deny benefits."). Procedural failures like the failure to provide a full and fair review may "provide grounds for a court to overturn an administrator's decision" if the failures "prejudice final determinations." *Love v. Dell, Inc.*, 551 F.3d 333, 338 (5th Cir. 2008). But Gray has not pointed to any facts which suggest that prejudice resulted from the redactions in this case. Thus, assuming without deciding that the redactions amount to a procedural failure, the court finds that Gray has not been prejudiced by it.

Lastly, Gray argues that Minnesota Life did not provide Mr. Gray with specific reasons for its denial and that Minnesota Life failed to respond to Mr. Gray's appeal and the alternative basis for coverage Mr. Gray provided. Dkt. 25 at 22–23. When denying claims, ERISA-covered plans must "(1) provide adequate notice; (2) in writing; (3) setting forth the specific reasons for such denial; (4) written in a manner calculated to be understood by the participant; and (5) afford a reasonable opportunity for a full and fair review by the administrator." *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 310 (5th Cir. 2015). In Minnesota Life's initial denial letter, it cites language from the Group Policies and then states that Mr. Gray's coverage was denied because he

"had a seizure, which caused [him] to fall, hit [his] head and resulted in blindness.  Because [his]

fall was the result of a medical condition, we are unable to approve [the] claim for benefits at this

time."  AR 493.  The letter provides specific reasons for Minnesota Life's denial of coverage

written in a manner calculated to be understood by the participant.  *Id.*  Therefore, the court finds

that Minnesota Life substantially complied with ERISA in its initial denial.

However, even if the initial denial was not in substantial compliance with ERISA

procedures, "a plan is in substantial compliance if its final level of review satisfies the purpose of

section 1133."  *Love*, 2008 WL 11411826, at *3.  In Minnesota Life's second denial letter, it

provides specific reasons for denying coverage, and it is written in a manner calculated to be

understood by the participant.  AR 689–90.  Minnesota Life cites language from the Group Policies

and then states that it is affirming its initial decision:

> During our review of the medical records, it was noted that Mr. Gray
>
> began having seizures in January 2016.  The records further note
>
> that the day prior to his November 27, 2016 incident, he had a
>
> seizure in which a relative caught him and laid him down on the
>
> couch.  This suggests that the seizure disorder was not well
>
> controlled by medication.  Based on the information that has been
>
> provided to us, it is our opinion that, because of his seizure disorder
>
> and recent history of seizures, the fall that caused Mr. Gray's
>
> blindness was not unexpected or unforeseen.

*Id.* at 689.

The letter provides an additional reason for denying coverage:

19

> The records note that Mr. Gray has been having seizures since
> January 2016.  His wife reported, on November 27, 2016, that Mr.
> Gray was standing in the kitchen when suddenly he stiffened and
> jerked backward hitting his head on the floor.  Because his medical
> event caused or contributed to the fall, the loss is excluded from
> coverage.

*Id.* at 690.

Gray contends that Minnesota Life ignored the exhibits provided in Mr. Gray's appeal, but Minnesota Life specifically states in the second denial letter that it considered the entire claim, "including the additional information provided with [the] appeal."  *Id.* at 689.  The record shows that Minnesota Life received the formal appeal letter and attachments and that the appeal was forwarded to the reviewing physician for her to "review the file in [its] entirety and provide [an] opinion on the cause of the fall and injury."  *Id.* at 87.  Thus, the court finds that Minnesota Life is in substantial compliance with ERISA and declines to remand this case to the plan administrator.

## V. CONCLUSION

For the aforementioned reasons, Gray's motion for judgment on the administrative record is DENIED.  Minnesota Life's request for judgment in its favor is GRANTED.  Gray's claims are DISMISSED WITH PREJUDICE.  The court will enter final judgment concurrent with this order.

Signed at Houston, Texas on March 8, 2021.

_____
Gray H. Miller
Senior United States District Judge

20